UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THOMAS RICCIO,           )
    Plaintiff,           )
                         )
v.                       )     Case No.  03 C 7839
                         )     Magistrate Judge Geraldine Soat Brown
OFFICER RIGGLE, Star #108 et al.,  )
    Defendant.           )
                         )

## MEMORANDUM OPINION AND ORDER

Plaintiff Thomas Riccio ("Riccio") brought this action pursuant to 42 U.S.C. § 1983, alleging

that police officers Richard Riggle, Katherine Alexander, Michael Hicks, Eric Laws, Scott Rose,

Donald Pate, and the Village of West Dundee (collectively, "Defendants"), violated Riccio's

constitutional rights when they unlawfully placed him under arrest for domestic battery. (Pl.'s Am.

Compl. ¶¶ 1-21.) [Dkt 14.]  Riccio further alleges a pendent state law claim of malicious

prosecution. (*Id.* ¶¶ 20-24.) Defendants have moved for summary judgment. [Dkt 25.] The parties

have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. §

636(c). [Dkt 5, 6.]  For the reasons set forth below, Defendants' motion for summary judgment is

granted.

## FACTUAL BACKGROUND[1]

### A.    The 9-1-1 hangup call

Riccio and his wife, Gertrude ("Trudy") Riccio, have lived in West Dundee since 1998. (Pl.'s LR Resp. ¶ 1; Defs.' LR Resp. ¶¶ 15, 16.)[2] On September 24, 2002, at approximately 4:30 p.m., Riccio returned home from his employment to discover that his wife had been drinking in the basement while doing laundry. (Pl.'s LR Resp. ¶¶ 2, 3.) The two of them began to argue about Trudy's consumption of alcohol. (*Id.* ¶ 3.) Trudy claims to have consumed one half bottle of brandy, three beers, and a couple of mixed drinks. (*Id.* ¶ 4; Defs.' LR Resp. ¶ 20.) The couple continued to argue as they went upstairs, and Riccio told Trudy that he was going to leave her. (Pl.'s LR Resp. ¶ 5; Pl.'s LR Stmt. ¶ 22; Pl.'s LR Ex. 1, Trudy Riccio Dep. at 20-22.) Trudy then made a 9-1-1 call but hung up before speaking with anyone. (Pl.'s LR Resp. ¶ 5; Defs.' LR Resp. ¶¶ 23, 24.) The West Dundee police department, pursuant to its policy of dispatching officers to the scene of any 9-1-1 hangup call, dispatched two of its officers, Laws and Hicks, to respond to the call. (Pl.'s LR Resp. ¶¶ 7-9; Defs.' LR Ex. 1, Affidavit of Erik Laws ¶ 5; Defs.' LR Ex. 2, Affidavit of Donald Pate ¶ 3; Defs.' LR Ex. 3, Affidavit of Richard Riggle ¶ 3.) Trudy claims that before the officers arrived, a dispatcher with Quadcomm, the 9-1-1 dispatch center which serves West Dundee, called her back, and she told the dispatcher to ignore her call. (Pl.'s LR Stmt. ¶ 25; Defs.' LR Stmt.

---

[1] The following facts are taken from the parties' responses to the respective statements of fact filed pursuant to Local Rule 56.1, which are cited herein as: "Pl.'s LR Resp. ¶ ___" [dkt 30] and "Defs.' LR Resp. ¶ ___" [dkt 37], and from the exhibits submitted with those statements or responses to those statements, or legal memoranda, which are cited herein as: "Pl.'s LR Ex. 1" [dkt 31, 32] and "Defs.' LR Ex. ___" [dkt 24, 36]. Statements not responded to or not controverted by specific references to the record are deemed admitted. L.R. 56.1 (b)(3).

[2] For the sake of clarity, Plaintiff Thomas Riccio will be referred to herein as "Riccio," and his wife, Trudy Riccio, will be referred to herein as "Trudy."

¶ 6; Defs.' LR Resp. ¶ 25; Trudy Riccio Dep. at 23-24.)

## B.    Officers Laws' and Hicks' investigation

As Officers Laws and Hicks traveled towards the Riccios' residence, Laws observed a green minivan backing out of a driveway. (Pl.'s LR Resp. ¶ 10.) Upon further approach, the officers discovered that the driveway from which the van had come was Riccio's. (*Id.*) Officer Hicks attempted to locate the van but was unsuccessful. (*Id.* ¶ 11.) The officers reached the Riccios' residence at approximately 7:00 p.m. (*Id.* ¶¶ 7-8; Defs.' LR Resp. ¶¶ 12, 18.) At the time of their arrival, they were unaware that Trudy had advised the dispatcher at Quadcomm to ignore her previous 9-1-1 hangup call. (Defs.' LR Stmt. ¶ 6.)[3]

Upon reaching the Riccios' house, the officers knocked several times and rang the doorbell, but did not receive any response, initially. (Pl.'s LR Resp. ¶¶ 11, 12; Defs.' LR Resp. ¶¶ 18, 19, 26; Trudy Riccio Dep. at 27.) Trudy finally came to the door, and appeared to be visibly upset and crying and shaking. (Pl.'s LR Resp. ¶ 13.) Officer Laws explained to Trudy the reason for their presence, to check on her well being as a result of the 9-1-1 hangup call. (*Id.* ¶ 14.) Trudy attempted to persuade the officers to drop the matter and leave her house, and told the officers that "nothing happened." (*Id.* ¶ 15; Defs.' LR Resp. ¶¶ 28, 30, 32, 33.) However, one of the officers noticed a bruise on Trudy's arm and asked her whether she had any bruises that they should know about. (Pl.'s LR Resp. ¶¶ 16, 19.) Trudy responded in the negative, asking them again to drop the matter. (*Id.*

---

[3] Riccio denies that statement; however, he cites no evidence to support his contention that the officers were aware of the call-back conversation between Trudy and the Quadcomm representative. (*See* Pl.'s LR Resp. ¶ 6; Trudy Riccio Dep. at 24-28; Defs.' Reply at 7 [dkt 36].) As such, that statement is deemed admitted. In addition, when Trudy was asked at her deposition whether she told the officers that someone from Quadcomm had called her back, Trudy testified, "I don't remember." (Trudy Riccio Dep. at 41.)

3

¶ 16.) One of the officers responded that "[s]omething must have happened," to which Trudy again replied that nothing had happened. (Defs.' LR Resp. ¶ 29.) The officers admit that neither of them observed any criminal activity by Riccio prior to their arrival at the Riccios' residence. (*Id.* ¶ 13.)

Hicks and Laws subsequently entered the Riccios' residence to check on the welfare of the Riccios' two children (Bradley and Keith), who were in the basement. (Defs.' LR Stmt. ¶ 17; Laws Aff. ¶¶ 15, 19.)[4] They also asked about the whereabouts of Riccio, and were advised that he had left before their arrival. (Defs.' LR Resp. ¶¶ 17, 21; Pl.'s LR Resp. ¶ 18; Laws Aff. ¶ 16.) Officer Laws testified that when he asked Trudy if her husband had hit her that night, Trudy stated that she did not want to get involved or she would "lose [her] income." (Laws Aff. ¶¶ 18, 20.) Trudy does not recall whether she had this conversation with the officers. (Trudy Riccio Dep. at 56-57.) Trudy testified that she felt she was being forced to allow the officers to stay, as she continued to ask the officers to leave, but they would not. (Defs.' LR Resp. ¶¶ 30-34; Trudy Riccio Dep. at 30.)

## C.    Sergeant Pate's investigation

Shortly thereafter, Sergeant Pate, one of two supervisors on duty at the time, arrived at the Riccios' residence. (Pl.'s LR Resp. ¶ 20; Defs.' LR Resp. ¶ 35.) Sergeant Pate, along with Sergeant Riggle, had monitored the initial dispatch of Officers Laws and Hicks. (Pl.'s LR Resp. ¶¶ 21, 29.) In addition, Sergeant Pate happened to be personally familiar with the Riccio family, not only through Riccio's employment with the West Dundee Department of Public Works, but in connection

---

[4] Riccio denies that the officers were "admitted" into the Riccios' residence. (Pl.'s LR Resp. ¶ 17.) However, during her deposition, Trudy testified that: "[The officers] said do you mind if we walk and check on your children. And I said no." (Trudy Riccio Dep. at 30.) She also testified that when the officers asked if they could check on the welfare of her children, she replied, "go ahead." (*Id.* at 31.) *See also* Defs.' Reply at 7-8. Thus, that statement is deemed admitted.

4

with a prior claim of domestic violence between Riccio and his wife. (*Id.* ¶¶ 21, 22.) Specifically, Sergeant Pate knew that Riccio had pled guilty to misdemeanor battery on his wife as a result of that prior incident. (*Id.* ¶ 23.) Sergeant Riggle was also aware of the prior domestic incident that had taken place at the Riccios' residence. (*Id.* ¶ 30.)

As the senior officer on the scene and because of his prior acquaintance with Trudy, Pate took over the questioning of Trudy regarding the events leading up to that point. (*Id.* ¶ 24.) When Pate asked Trudy if she had any bruises that the officers needed to be aware of, Trudy voluntarily lifted her shirt and pointed out a yellowish bruise on her back, which was approximately two to three inches in size. (*Id.* ¶ 25; Pate Aff. ¶ 11; Laws Aff. ¶ 26; Trudy Riccio Dep. at 38-39.) Trudy indicated that the bruise was the result of having been struck by her husband with a U-shaped plastic cabinet-locking device three days earlier. (Pate Aff. ¶¶ 12-13; Laws Aff. ¶¶ 26-29; Trudy Riccio Dep. at 39; Defs.' LR Stmt. ¶¶ 25-26.) Trudy pointed out the plastic lock, which was later photographed as part of the officers' investigation. (Defs.' LR Stmt. ¶ 26; Pl.'s LR Resp. ¶ 26; Trudy Riccio Dep. at 39.)[5]

While the officers were in the kitchen with Trudy, the telephone rang, but no one answered it because a cord was missing from the handset. (Pate Aff. ¶ 14.) When Officer Laws asked Trudy if her husband was the one who stopped her prior 9-1-1 call from being completed, Trudy stated that

---

[5] Riccio denies those two statements on the grounds that "Trudy [] denied Plaintiff caused any bruises" and denied that she "claimed she was hit with any such lock." (Pl.'s LR Resp. ¶¶ 25, 26.) However, the evidence cited by Riccio (Trudy's deposition testimony at 28-42) does not controvert Defendants' evidence that Trudy made those statements to the officers that night. In fact, some of the testimony cited by Riccio supports *Defendants'* position that she did make those statements to the officers. *See* Trudy Riccio Dep. at 38-40 (admitting that she might have told one of the officers that her injury was caused by "a plastic object" which was subsequently identified as the plastic U-shaped lock and photographed by the officers). *See also* Defs.' Reply at 8-9. Thus, those statements will be deemed admitted.

Riccio "ripped [the telephone] right out of the wall; he always does." (Laws Aff. ¶ 31.)[6] Pate asked Trudy if he could answer the phone if her husband called back, and Trudy said yes. (Pate Aff. ¶ 16.) Shortly thereafter, the phone rang again and Pate answered it and began speaking to Riccio. (Pl.'s LR Resp. ¶ 27; Pate Aff. ¶ 18.) During their conversation, Riccio denied hitting his wife that night, but admitted grabbing her wrists, and stated that "she bruises easily." (Pate Aff. ¶¶ 20, 23.) He further stated that his wife would never sign a complaint against him. (Id. ¶ 21.) He refused to tell Pate where he was, and refused to return to his residence to discuss the evening's incident. (Id. ¶ 19.) Pate advised him that, based on the information the officers had received, coupled with the visible evidence of injuries to Trudy, he would be signing the criminal complaints for which Riccio would be required to respond. (Id. ¶ 22.) Pate further advised Riccio that if he failed to turn himself in the following morning, a warrant would be issued for his arrest. (Id. ¶ 24.) Pate also advised Trudy that he would file charges against Riccio even though she stated that her husband did not hit her and did not want any charges filed against him. (Defs.' LR Resp. ¶¶ 39, 42.) Pate and Laws then returned to the police station and began preparing misdemeanor complaints and other paperwork in connection with the charges being lodged against Riccio. (Pl.'s LR Resp. ¶ 28.)

**D.    Sergeant Riggle's and Officer Alexander's investigation**

Sergeant Riggle was at the station when Pate and Laws arrived, and, after being apprised of the results of their investigation, decided to visit the Riccio residence himself with a female police

---

[6] At her deposition, Trudy testified that when Pate asked her about the broken phone cord, she told him that the phone had been broken for months and that a cordless wireless was sitting right next to it. (Trudy Riccio Dep. at 33.) Trudy conceded, however, that she does not recall telling Pate that her husband ripped the phone out of the wall (id. at 41), as her recollection of the events of that evening was "highly" affected by her level of intoxication that night (id. at 34).

officer, Katherine Alexander, to obtain a statement from Trudy and take photographs of her injuries. (*Id.* ¶ 31; Pl.'s LR Stmt. ¶ 36; Defs.' LR Resp. ¶ 36.) Upon their arrival, Sergeant Riggle observed bruising on each of Trudy's upper arms, midway up each bicep. (Pl.'s LR Resp. ¶ 32.) Riggle advised Trudy that it appeared that someone had been gripping her arms, and asked if that had occurred that evening. (*Id.*; Riggle Aff. ¶ 10.) According to Riggle, Trudy's response was, "Yes . . . , thank you for noticing the marks." (Defs.' LR Stmt. ¶ 33; Riggle Aff. ¶ 11.)[7] Sergeant Riggle then went downstairs and obtained a statement from Riccio's twelve-year old son, Bradley. (Pl.'s LR Resp. ¶ 34.)

In the meantime, Officer Alexander was photographing Trudy's injuries and the U-shaped plastic lock, and attempting to obtain a statement from Trudy. (*Id.*) Trudy told Alexander several times that she did not want to sign a complaint against her husband and that he did not hit her. (Defs.' LR Resp. ¶ 37.) Trudy asserts that Officer Alexander attempted to force her to write a statement or sign a complaint against her husband. (Pl.'s LR Stmt. ¶¶ 38, 41; Trudy Riccio Dep. at 36-38.) In support of that assertion, Trudy testified that Alexander held up a clipboard and tried to give her a pen, telling her to "write what happened tonight." (Defs.' LR Resp. ¶¶ 38, 41; Trudy Riccio Dep. at 38.) She also testified that Alexander told her "what to write." (Trudy Riccio Dep. at 35.) According to Riccio, Trudy was "so drunk" that night that she was not physically able to write a coherent, legible statement. (Pl.'s LR Stmt. ¶ 40; Trudy Riccio Dep. at 34-36.) Ultimately, Trudy wrote and signed a statement. (Def.'s Ex. 6, Trudy Riccio Dep., Ex. 1; Trudy Riccio Dep. at

---

[7] Riccio denies that statement, citing Trudy's deposition testimony at pages 28-42 in support of his denial. (Pl.'s LR Resp. ¶ 33.) However, the testimony cited does not controvert Defendants' evidence that she responded in that manner. Instead, Trudy's testimony indicates only that Trudy *does not recall* if she responded in that manner. *See* Trudy Riccio Dep. at 28-42. As Riccio cannot provide evidence to contradict Defendants' evidence on this issue, the statement will be admitted.

36.)

## E.  Riccio's Arrest

The following day, Trudy called the West Dundee police department and spoke to Captain Sawyer. (Defs.' LR Resp. ¶¶ 43, 44.) She reiterated that she did not want to file any charges against Riccio. (*Id.* ¶ 45.) Sawyer told her that the charges were already in process. (Pl.'s LR Stmt. ¶ 47; Trudy Riccio Dep. at 42.)

Riccio was given two days to turn himself in to police custody for his arrest to be processed, and he turned himself in on September 26, 2002. (Pl.'s LR Stmt. ¶ 50; Defs.' LR Resp. ¶ 50.) He was charged with domestic battery, and subsequently found not guilty of the charge. (Defs.' LR Resp. ¶¶ 51, 52.)

## F.  Officer Rose's involvement in the investigation and charges against Riccio

Like the other individual defendants, Scott Rose is a police officer employed by the West Dundee police department. (Pl.'s LR Resp. ¶ 35.) Although Rose was working during the afternoon of September 24, 2002, he at no time responded to Trudy's 9-1-1 hangup call, and played no role whatsoever in the investigation, arrest, or processing of the arrest of Riccio. (*Id.* ¶ 36; Defs.' LR Ex. 4, Affidavit of Scott Rose ¶ 3; Laws Aff. ¶¶ 40, 41; Pate Aff. ¶¶ 27, 28; Riggle Aff. ¶¶ 15, 16.) Riccio admits that "[t]he only evidentiary basis offered" for the inclusion of Rose as a defendant in this suit is that his name was mentioned at Riccio's trial. (Pl.'s LR Resp. ¶¶ 37, 39.) Defendants maintain that Riccio has confused Officer Rose's identity with that of Officer Laws, who testified at Riccio's trial. (*See* Defs.' LR Stmt. ¶¶ 37, 38, 40; Defs.' LR Ex. 7, Thomas Riccio Dep. at 36-38; Defs.' Reply at 2.) Riccio does not appear to dispute that point. (*See* Pl.'s LR Resp. ¶¶ 36-40.)

## LEGAL STANDARD

The court may properly grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Id.* at 255. The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met the initial burden, the non-moving party must designate specific facts showing that there is a genuine issue for trial. *Id.* at 324. The non-moving party must support its contentions with admissible evidence and may not rest upon the mere allegations in the pleadings or conclusory statements in affidavits. *Id.* *See also Winskunas v. Birnbaum*, 23 F.3d 1264, 1267 (7th Cir. 1994) (non-moving party is required to present evidence of "evidentiary quality" (*i.e.*, admissible documents or attested testimony, such as that found in depositions or in affidavits) demonstrating the existence of a genuine issue of material fact). "[N]either 'the mere existence of some alleged factual dispute between the parties' . . . nor the existence of 'some metaphysical doubt as to the material facts,' is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (quoting *Anderson*, 477 U.S. at 247 and *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Thus, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury

9

could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## DISCUSSION

Defendants argue that defendant police officers Riggle, Alexander, Hicks, Laws, and Pate are entitled to summary judgment on Riccio's § 1983 claim because: (1) probable cause existed to support Riccio's arrest; and (2) they are shielded from civil tort liability under the qualified immunity doctrine. (Defs.' Mot. at 3, 6-9; Defs.' Mem. at 1-11.) Defendants argue that defendant police officer Rose is also entitled to summary judgment on Riccio's § 1983 claim because there is no evidence of "any involvement whatsoever in the arrest of [Riccio] by Officer Scott Rose." (Defs.' Mot. at 9; Defs.' Reply at 1-3.) Defendants also argue that they are entitled to summary judgment on Riccio's pendent state law malicious prosecution claim. (Defs.' Mem. at 11-12.)

### A. Riccio's § 1983 claim

### 1. Whether the five officers who were involved in Riccio's arrest (Riggle, Alexander, Hicks, Laws, and Pate) are entitled to summary judgment on Riccio's § 1983 claim.

#### a. Probable cause existed to support Riccio's arrest.

In order to prevail on a § 1983 action alleging unlawful arrest, a plaintiff must demonstrate the absence of probable cause. *Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989) (stating that "the existence of probable cause for arrest is an absolute bar to a Section 1983 claim for unlawful arrest"). Probable cause exists "if at the moment the arrest was made . . . the facts and circumstances within [the arresting officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that a crime had been committed. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (quotation omitted). Contrary to what its

name might seem to suggest, probable cause "demands even less than 'probability' . . . ; it requires more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) (internal and end citations omitted). In practice, it can be said that "[p]robable cause – the area between bare suspicion and virtual certainty – describes not a point but a zone," *Llaguno v. Mingey*, 763 F.2d 1560, 1565 (7th Cir. 1985) (*en banc*), *abrogated on other grounds* by *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991); *Bell v. Irwin*, 321 F.3d 637 (7th Cir. 2002), within which reasonable mistakes will be excused. *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994) (citing *Brinegar v. United States*, 338 U.S. 160, 176 (1949). In addition, "[p]robable cause does not depend on the witness turning out to have been right; it's what the police know, not whether they know the truth, that matters." *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 439 (7th Cir. 1986). Thus, courts evaluate probable cause "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). When the question of probable cause arises in a damages suit, "its resolution typically falls within the province of the jury, though a conclusion that probable cause existed as a matter of law is appropriate when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Sheik-Abdi*, 37 F.3d at 1246 (citations omitted).

In response to Defendants' motion for summary judgment, Riccio makes two overarching, alternative arguments as to why the officers did not have probable cause to arrest him for domestic battery.[8] Riccio's first argument is that the officers "acted in defiance" of the report made by Trudy,

---

[8] A domestic battery is committed when a person intentionally or knowingly without legal justification and by any means: (1) causes bodily harm to any family or household member,

who was the only eye witness, in that she never reported a crime, did not want to press charges, and told the officers that her husband did not hit her. (Pl.'s Mem. at 7-8.) Riccio states that the officers acted unreasonably in choosing to disregard Trudy's account, because officers "can rely on the accounts of victims and eye witnesses," and "are not at liberty to assume an inebriated witness is not credible when she tells them no crime was committed." (*Id.*) (Notably, Riccio does not explain or provide any authority to support that argument.) Riccio goes on to state that if the officers choose to believe a victim is lying, "they do so at their own peril." (*Id.* at 8-9.) That argument has several problems, the first being that Trudy could not deny having told the officers that the large bruise on her back was caused by her having been struck with a plastic lock (which she subsequently identified to the officers), and did not controvert Defendants' evidence that she also told them the injury had been inflicted by her husband. (Pl.'s LR Resp. ¶¶ 25-26; Trudy Riccio Dep. at 38-39; Pate Aff. ¶¶ 11-13; Laws Aff. ¶¶ 26-29.) Nor could Trudy deny that she answered "yes" to one of the officer's queries that it appeared someone had been grabbing her arms that evening; and Riccio himself told Pate that he had grabbed Trudy's wrists. (Pl.'s LR Resp. ¶¶ 32-33; Pate Aff. ¶ 23; Riggle Aff. ¶¶ 10, 11.) Thus, although Trudy might have told the officers to leave her house and that she did not want to press charges, this is not a case where the officers "acted in defiance" of, or disregarded, Trudy's report. Rather, the officers clearly relied on certain portions of Trudy's report in determining that there was probable cause to arrest Riccio. *See, e.g.*, Pate Aff. ¶¶ 11-13; Laws Aff. ¶¶ 26-29; Riggle Aff. ¶¶ 9-11; *see also* Laws Aff., Ex. A at 12, 13 (complaints filed by Pate against Riccio).[9]

---

or (2) makes physical contact of an insulting or provoking nature with any family or household member. 720 ILCS 5/12-3.2.

[9] In a motion to strike Defendants' Exhibit A, which is discussed further herein, Riccio states that he objects to the admissibility of the complaints filed by Pate against Riccio to the extent those documents are offered for the truth of the matters contained therein. (Pl.'s Mot.

However, even if the officers had chosen to disregard Trudy's account (*e.g.*, to the extent she also stated that her husband did not hit her), the officers were not required to believe her in this regard if there was other evidence tending to show that she was lying. As even Riccio subsequently acknowledges, "[o]fficers might choose to disregard an eyewitness . . . , a prudent decision when the witness is not credible." (Pl.'s Mem. at 8.)

Riccio's second argument is that, even if Trudy did implicate Riccio in some crime, she was too intoxicated to be considered a reasonable and credible witness sufficient to generate probable cause to arrest him. (*Id.* at 9-10.) Riccio argues that when "the officer has reason to believe the witness is either not sober or lying, a reasonable and prudent officer will not make an arrest." (*Id.* at 9.) In other words, Riccio argues that there cannot be probable cause to make an arrest when the witness is intoxicated. Riccio cites *Gramenos*, 797 F.2d at 439, in support of his argument. (*Id.*) *Gramenos* does not stand for such broad sweeping premise, however. In *Gramenos*, the court stated that "[a] 'prudent' officer *may* balk if the person . . . leveling the accusation is babbling or inconsistent." *Id.* at 439 (emphasis added). The court did not state that an officer *must* balk at any story being told by an intoxicated person. Thus, the fact that Trudy was intoxicated does not mean that everything she said must be discounted or that the officers were precluded from finding probable cause to arrest Riccio, particularly when other evidence existed to provide probable cause for Riccio's arrest.[10]

---

Strike ¶ 3.) [Dkt 29.] The court has not relied on the complaints for the truth of the matters contained therein, but has considered them to the extent they demonstrate what the officers relied upon in deciding to file those charges.

[10] Riccio also argues that probable cause was lacking because: the officers did not see Riccio commit a crime that day, the officers did not have a warrant to arrest him, and Riccio was eventually found not guilty of the charges filed against him. (Pl.'s Mem. at 3, 5.) Those arguments do not support Riccio's argument that probable cause was lacking, however. *See* 750

Defendants point to numerous factors supporting their finding that there was probable cause to place Riccio under arrest. Specifically, the officers state that they: (1) received a 9-1-1 hangup call; (2) discovered Trudy in an agitated, disheveled and intoxicated state; (3) were told by Trudy that she had had an altercation with her husband that evening; (4) were told by the Riccios' oldest son that his parents had been fighting; (5) were aware that there was a history of domestic abuse between the parties involved in the dispute; (6) observed physical injuries on Trudy's body; (7) were told by Trudy that she had been struck by her husband with a U-shaped plastic lock, and received a positive answer to their question of whether someone had been grabbing her arms that evening; and (8) were told by Riccio that he had grabbed Trudy's wrists (but that she "bruises easily"). (Defs.' Mot. at 8; Defs.' Mem. at 5-7, 10; Defs.' Reply at 10-11, 14; Pl.'s LR Resp. ¶¶ 5, 13, 16, 19; 22-23, 25-26, 30, 32-33; Trudy Dep. at 28-29, 55; Laws Aff. ¶ 26; Pate Aff. ¶¶ 11-13, 23; Riggle Aff. ¶¶ 9-11.) In addition, Defendants argue that they were aware of and their actions were consistent with the procedures set out in Illinois statutory law and their own department regulations regarding domestic violence cases. (Pl.'s LR Resp. ¶ 31; Defs.' Mot. at 8; Defs.' Mem. at 5; Defs.' Reply at 11-12.) Finally, Defendants point out that even the judge assigned to Riccio's case found that "there is probable cause to hold the defendant [Riccio] for trial on such charge." (Defs.' Mem.

---

ILCS § 60/301(a) ("[a]ny law enforcement officer may make an arrest without warrant if the officer has probable cause to believe that the person has committed or is committing any crime . . . even if the crime was not committed in the presence of the officer"); *Humphrey v. Staszak*, 148 F.3d 719, 728 (7th Cir. 1998) (the fact that the charges against a defendant were later dismissed "does not mean there was no probable cause for his arrest").

    In addition, Riccio argues that the officers did not offer to take Trudy to a treatment center or give her contact information for abused and battered women. (Pl.'s Mem. at 5.) Although there is support in the record to show that Officer Hicks gave Trudy a domestic violence handout (*see* Laws Aff., Ex. A at 3 (Laws' investigative report)), doing so is not required in order to demonstrate probable cause.

at 7) (citing Laws Aff., Ex. A at 20.)[11]

Applying the standard set forth above, the court finds that a prudent officer would have believed, based on the totality of the circumstances, that probable cause existed to arrest Riccio for the crime of domestic battery. Although Trudy refused to sign a complaint against her husband, Defendants have argued that "[t]he single greatest challenge to attempts by law enforcement officials to address domestic violence cases remains the historical unwillingness of victims to testify against their attackers." (Defs.' Reply at 13.) The officers could not reasonably have taken Trudy's unwillingness to sign a complaint, or her subsequent denials as to the source of her injuries, as a dispositive factor in this case, particularly based on the uncontroverted evidence regarding the Riccios' history of domestic violence, Trudy's physical manifestations of injury, and Trudy's statements to the police as to the cause of the bruise on her back. *See id.*; Pl.'s LR Resp. ¶¶ 25-26; 32-33; Trudy Riccio Dep. at 38-39; Pate Aff. ¶¶ 11-13, 17, 23; Laws Aff. ¶¶ 18, 20, 26-29, 31, 34; Riggle Aff. ¶¶ 9-11. As mentioned above, not only did Trudy admit to being struck with a U-shaped plastic lock, but Riccio cannot (or did not) dispute Defendants' evidence that she also told the officers the bruise was caused by her husband, responded positively to an officer's question regarding whether someone had grabbed her arms that evening, stated that she did not want to get involved in the investigation or she would lose her income (in response to an officer's question as to whether her husband had hit her that night), and stated that her husband had ripped the phone out of the wall while she was attempting to dial 9-1-1. Nor did Riccio dispute that he himself told the

---

[11] It should be noted that in *Simmons v. Pryor*, the Seventh Circuit held that a judicial officer's finding of probable cause to issue a warrant is not a dispositive factor as to whether probable cause existed; rather, courts must make their own determinations as to whether a reasonable officer would have believed that the person had committed a crime. 26 F.3d 650, 653 (7th Cir. 1994).

officers that he had grabbed Trudy's wrists that night.

Moreover, Defendants' actions appear to have been consistent with Illinois statutory law and their departmental regulations. *See, e.g.*, 750 ILCS § 60/304(a) (stating that "[w]henever a law enforcement officer has reason to believe that a person has been abused, neglected, or exploited by a family or household member, the officer shall immediately use all reasonable means to prevent further abuse . . . including: (1) Arresting the abusing . . . party, where appropriate"); Defs.' LR Ex. 5, West Dundee Police Department Operations Order 217 - Domestic Violence Protocol regulations at 6 (stating that "[i]n those cases where the victim is reluctant to sign complaints, and there is evidence of physical abuse, the officer on the scene will sign the complaint on behalf of the victim"); Pl.'s LR Resp. ¶ 31 (admitting that Riggle's decision to return to the Riccio residence with a female police officer was "consistent with [the] Department's Domestic Violence Protocol"). Courts have found such evidence to be supportive of a finding of probable cause. *See, e.g., Simmons*, 26 F.3d at 654-55 (finding no issue as to probable cause where the officer stated that he was aware of the mandates of the Domestic Violence Act, which obligates officers to take steps to ensure the safety of domestic violence victims); *Gerald M. v. J. Conneely*, 858 F.2d 378, 382 (7th Cir. 1988) (finding there was probable cause to detain juveniles where officer's actions were consistent with procedures set out in Illinois statutory law).

Riccio argues that the evidence relied upon by the police officers in support of their probable cause finding can be explained away. For instance, Riccio states that Trudy's bruises can be explained by the fact that "[a]lcoholics fall, and they bruise easily." (Pl.'s Mem. at 11.) He also states that there was no reason for the officers to believe that the bruises appeared "within minutes," as the officers responded so quickly that there was no time for a bruise to appear. (*Id.* at 12.) In

addition, Riccio states that the officers should not have concluded that the bruise on Trudy's back was caused by the U-shaped plastic lock, as the marking on her back was not a current injury and did not match the shape of the lock, and the lock was secured to a cabinet. (*Id.* at 12-13.) However, as Defendants explained in their reply brief, Riccio was charged with domestic battery for having struck his wife on the back with the plastic lock *three days prior* to the 9-1-1 hangup call, based on Trudy's report that that was when the incident occurred. (Defs.' Reply at 13; Laws Aff., Ex. A at 12; Pate Aff. ¶ 12; Laws Aff. ¶ 26.) Three days was more than enough time for the bruises to appear and for someone to have returned the lock to the cabinet doors. (Defs.' Reply at 13-14.) As for Riccio's argument that the bruises might be a result of the fact that "[a]lcoholics fall," the court does not agree that the officers were required to reach that conclusion, particularly in light of other evidence provided to them by Trudy. *See Graham*, 490 U.S. at 396 (stating that courts evaluate probable cause "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight").

Lastly, Riccio argues that the officers should have made further inquiry before preparing the complaint for his arrest. (Pl.'s Mem. at 10-11.) In support of that argument, Riccio states that "when there is a lapse of time between the alleged criminal behavior, and the arrest, further investigation is appropriate, if not mandatory." (*Id.* at 10.) Riccio argues that here, rather than allaying their suspicions, the officers "chose to terminate their investigation for personal reasons, at least one of the officers was known to 'hate' Plaintiff." (*Id.* at 11) (citing Trudy Riccio Dep. at 40.) The Seventh Circuit has made clear that "the law does not require that a police officer conduct an incredibly detailed investigation at the probable cause stage, even if ideally that might appear to be a more desirable approach." *Gerald M.*, 858 F.2d at 381 (citation omitted). *See also Gramenos*, 797 F.2d

at 439 ("There is no constitutional or statutory requirement that before an arrest can be made the police must conduct a trial."); *Schertz*, 875 F.2d at 583 (stating that "once police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence"); *Woods*, 234 F.3d at 997 (stating that "even if the police . . . had made no effort to investigate or corroborate [the victim's] version of the events, they would have been justified in making the arrest provided that a reasonable officer would have found [the victim's] complaint to be reasonably credible"). However, in this case the officers *did* conduct further investigation after the initial dispatch of Officers Laws and Hicks to the scene. First, Sergeant Pate went to the Riccios' residence to investigate further; then, Sergeant Riggle and Officer Alexander returned to the residence to obtain statements and collect additional evidence. Finally, as for Riccio's suggestion that the officers terminated their investigation early because at least one of them "hated" Riccio, the court notes that, as an initial matter, the only evidence that could possibly support that theory is Trudy's testimony that she "kn[ew] [Pate] hated [her] husband," although she admitted that Pate never told her that, and never explained the basis for her belief otherwise. (Trudy Riccio Dep. at 40.) More importantly, though, even malicious motives will not support a § 1983 claim based on false arrest if probable cause exists. *Fernandez v. Perez*, 937 F.2d 368, 371 (7th Cir. 1991); *see also Schertz*, 875 F.2d at 582 (stating that the plaintiff's claim – "that the investigating officers harbored malicious motives towards him – does not address an issue material to the disposition of this case").

Thus, in summary, the officers' decision to arrest Riccio for domestic battery easily falls within the zone of probable cause, and Riccio cannot establish an essential element of his § 1983 claim. As such, summary judgment on this claim is appropriate.

18

**b.** **Defendants are also shielded from liability by the qualified immunity doctrine.**

However, even if Riccio had raised a factual issue with respect to probable cause, Defendants would still be entitled to summary judgment on Riccio's § 1983 claim on the basis of qualified immunity. *See Llaguno*, 763 F.2d at 1569 (immunity a question of law appropriate for resolution on summary judgment). Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity thus shields a police officer from § 1983 liability "if *either* the federal law he is asserted to have breached was not clearly established at the time of the alleged violation or there exists no genuine dispute of material fact which would prevent a finding that his actions, with respect to following such clearly established law, were objectively reasonable." *Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998) (citations omitted). There is no dispute that the constitutional right to be free from arrest without probable cause was "clearly established" prior to Riccio's arrest in September 2002. *See id.* (citation omitted); *see also* Defs.' Mot. at 8 (conceding that fact). Thus, the question is whether a reasonable officer could have believed Riccio's arrest was lawful, in light of the clearly established right to be free from arrest without probable cause and the information possessed by the officers at the time of the arrest. *Jenkins*, 147 F.3d at 585. If so, the officer is shielded from § 1983 liability against Riccio's claim of false arrest. *See Hunter*, 502 U.S. at 227.

In analyzing the reasonableness of the officer's belief, the court must "determine if the officer actually had probable cause or, if there was no probable cause, whether a reasonable officer could

19

have mistakenly believed that probable cause existed." *Humphrey*, 148 F.3d at 725. If the officers had probable cause to arrest the plaintiff, that will serve as an absolute bar to the plaintiff's claim. *Fernandez*, 937 F.2d at 370. If the officers did not have probable cause, a court must determine "whether the officer had 'arguable' probable cause." *Humphrey*, 148 F.3d at 725. Arguable probable cause exists when "a reasonable police officer in the same circumstances . . . and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." *Id.* (quotation omitted). The inquiry focuses on "the objective legal reasonableness of the action, not the state of mind or good faith of the officials in question." *Erwin v. Daley*, 92 F.3d 521, 525 (7th Cir. 1996) (citation omitted). Allegations of malice are insufficient to overcome the immunity defense. *Schertz*, 875 F.2d at 583.

Defendants argue that they are entitled to qualified immunity because the individual defendant police officers had reasonable grounds to believe that a domestic battery offense had been committed by Riccio. (Defs.' Mem. at 1-8, 10; Defs.' Reply at 10-14.) As discussed above, the court has already found that the officers had probable cause to arrest Riccio. However, even if the court had not found that probable cause existed to support the officers' arrest, there would certainly have been "arguable" probable cause for the arrest, as there is no question, in light of the facts discussed above, that the officers' actions with respect to Riccio's arrest were objectively reasonable, *i.e.*, an officer in the same circumstances and with the same knowledge as the officers in question *could* have reasonably believed that probable cause existed. *See Humphrey*, 148 F.3d at 725. Thus, Defendants are entitled to summary judgment on Riccio's § 1983 claim on the basis of qualified immunity, as well.

## 2.    Whether Officer Rose is entitled to summary judgment on Riccio's § 1983 claim.

Defendants argue that absent some admissible evidence to create a genuine issue of material fact as to Officer Rose's liability in this matter, Officer Rose is also entitled to summary judgment. Defendants argue that Rose never traveled to the Riccio residence in connection with the investigation of the 9-1-1 hangup, nor played any role whatsoever in the investigation, arrest, or processing of the arrest of Riccio. (Pl.'s LR Resp. ¶¶ 36-37, 39; Rose Aff. ¶ 3; Laws Aff. ¶¶ 40, 41; Pate Aff. ¶¶ 27, 28; Riggle Aff. ¶¶ 15, 16.) According to Defendants, Rose's involvement was limited to working the afternoon shift on September 24, 2002 and hearing, via the radio, that Laws and Hicks had been dispatched to the Riccios' residence. (Rose Aff. ¶ 3.)

Riccio offers no argument whatsoever in response to Defendants' argument. *See* Pl.'s Mem.; Defs.' Reply at 1. In addition, as Defendants point out, Riccio has now admitted that Officer Rose had no involvement in this case. *See* Pl.'s LR Resp. ¶¶ 36-37, 39; Defs.' Reply at 2, 3. Because there is no evidence that Officer Rose played any role in any of the events leading up to Riccio's arrest, Officer Rose is also entitled to summary judgment on Riccio's § 1983 claim. *See Jenkins*, 147 F.3d at 583-84, 586 (affirming summary judgment in favor of officer who neither "caused nor participated in" the plaintiff's arrest, in plaintiff's § 1983 claim).

## B.    Riccio's malicious prosecution claim

Although it is not entirely clear what type of claim Riccio is alleging in Count III of his amended complaint, Defendants assume that he is alleging a state law claim of malicious prosecution, and Riccio does not dispute that assumption. *See* Defs.' Mem. at 11-12. Nor does Riccio respond in any way to Defendants' argument that they are entitled to summary judgment on

Riccio's malicious prosecution claim. *See* Pl.'s Mem. at 1-14. Because Riccio's federal § 1983 claim has been dismissed, this court has the discretion to either address or remand to state court the supplemental state law claim of malicious prosecution. *See Payne v. Churchich*, 161 F.3d 1030, 1043 (7th Cir. 1998); *see also Simmons*, 26 F.3d at 655 (dismissing malicious prosecution claim on jurisdictional grounds after dismissing on summary judgment plaintiff's § 1983 claim). In this case, the court will address Riccio's state law malicious prosecution claim, as it is easily disposed of.

The court finds that Defendants are entitled to summary judgment on this claim, as well, as probable cause is an absolute defense to Riccio's state law claim of malicious prosecution, *see, e.g., Mosley v. La-Mastus*, 741 F. Supp. 724, 726 (N.D. Ill. 1990), and the court has already found that Defendants had probable cause to arrest Riccio. That is so "regardless of whether the defendants had malicious motives for arresting the plaintiff." *Mark v. Furay*, 769 F.2d 1266, 1269 (7th Cir. 1985). Thus, Defendants are entitled to summary judgment on Riccio's malicious prosecution claim.

## C. Defendants' request for attorney's fees and costs expended in defending Officer Rose pursuant to Rule 11 and 42 U.S.C. § 1988

In December 2003, Defendants' counsel sent a letter to Riccio's counsel stating that he would seek sanctions pursuant to Rule 11 if Officer Rose's name continued to appear in the litigation as a party defendant. (Defs.' LR Ex. 9 at 2.) Defendants' counsel explained that Officer Rose had not participated in any way in either the investigation or the subsequent arrest of Riccio. (*Id.* at 1.) Defendants assert that, since that time, Riccio's counsel has failed to respond to Defendants' counsel's request for the basis of including Officer Rose as a defendant in this case, and Riccio has now (in his response to Defendants' motion for summary judgment) admitted that Officer Rose had no involvement in the case. (Defs.' Reply at 2, 3; Pl.'s LR Resp. ¶¶ 36-37, 39.) Because Riccio's

counsel failed to remove Officer Rose's name from the pleadings in light of those facts, Defendants assert that, pursuant to Rule 11 and 42 U.S.C. § 1988, they are entitled to all attorney's fees and costs engendered in Rose's defense. (Defs.' Reply at 1-3, 15.) Riccio does not respond to Defendants' request.

Rule 11(c)(1)(A) provides that "[a] motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b)." Fed. R. Civ. P. 11(c)(1)(A). In this case, although Defendants' counsel sent a letter to Riccio's counsel advising him that he would seek sanctions pursuant to Rule 11 if Officer Rose's name was not removed from the pleadings, he did not follow the procedure set out in Rule 11 that a motion for sanctions be made *separately* from other motions or requests. *See Id.* The request for sanctions was made in Defendants' reply brief, and therefore was not made separately, as required. As such, Defendants are not entitled to an award of sanctions pursuant to Rule 11.

Defendants' request for attorney's fees and costs pursuant to 42 U.S.C. § 1988 is also denied. Section 1988 provides that a court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of its costs in § 1983 actions. 42 U.S.C. § 1988. When a defendant is the prevailing party, the court may award attorney's fees to that defendant upon a finding that the plaintiff's action was "vexatious, frivolous, or brought to harass or embarrass the defendant," or if the plaintiff's action was "meritless in the sense that it is groundless or without foundation." *Curry v. A.H. Robins Co.*, 775 F.2d 212, 219 (7th Cir. 1985) (quotations omitted); *see also Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 417-22 (1978); *Munson v. Milwaukee Bd. of Sch. Directors*, 969 F.2d 266, 269 (7th Cir. 1992). This is a close question because clearly Officer Rose should not have been named a defendant in this case. However, on balance, the court declines to award

23

attorney's fees. There is no basis to believe that Officer Rose was named as a defendant for any improper motive, such as to harass or embarrass him. Also, it does not appear that Defendants incurred any meaningful amount of attorney's fees to obtain judgment in favor of Officer Rose that they would not have incurred to defend the other defendants. The cost of complying with Local Rule 54.3 would almost certainly exceed the incremental attorney's fees (if any) that were incurred because Officer Rose was included among the defendants. Accordingly, Defendants' request for attorney's fees under § 1988 is denied. Taxable costs pursuant to 28 U.S.C. § 1920 are awarded to Defendants.

**D.      Riccio's Motion To Strike Defendants' Exhibit A**

Lastly, Riccio moves to strike Defendants' Exhibit A. (Pl.'s Mot. Strike.) Exhibit A consists of the case report prepared by Officer Laws upon his return to the police department, as well as some of the other paperwork generated by the Village of West Dundee police department as a result of the incident. (Laws Aff. ¶¶ 37, 38; *id.*, Ex. A.) The entire exhibit (which is 21 pages) includes: the investigative reports of Officer Laws, Officer Alexander, and Captain Sawyer (Exhibit A at 1-4, 11, 15-16), photographs of Trudy's injuries and the U-shaped plastic lock taken by Officer Alexander (*id.* at 5-8), witness statements by Trudy and her son, Bradley (*id.* at 9-10), three complaints against Riccio filed by Sergeant Pate (*id.* at 12-14), and documents associated with Riccio's surrender and the subsequent court proceedings (*id.* at 17-21). As mentioned previously, Riccio objects to the admissibility of the complaints filed by Pate against Riccio to the extent they are offered for the truth of the matters asserted therein, but he does not object to the admission of those documents to the

24

extent they are offered merely to show that criminal charges were filed against Riccio. (Pl.'s Mot. Strike ¶ 3.) Riccio objects to the remaining 18 pages in the Exhibit. (*Id.* ¶¶ 4-10.)

In ruling on Defendants' motion for summary judgment, the court disregarded Exhibit A, with the exception of the complaints filed by Pate against Riccio (Ex. A at 12-14), as the court did not rely on those complaints for the truth of the matters asserted therein. Therefore, Riccio's motion to strike is denied as moot. *See Randall v. Unitech Sys., Inc.*, 243 F. Supp. 2d 822, 825 n. 2 (N.D. Ill. 2003) (denying as moot a motion to strike because "[i]n granting defendant's motion for summary judgment, the court did not consider this evidence").

## CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment is granted, Defendants' request for sanctions, attorney's fees and costs is denied, and Plaintiff's Motion to Strike Defendants' Exhibit A is denied as moot.

IT IS SO ORDERED.

Geraldine Soat Brown
United States Magistrate Judge

March 23, 2005

25